UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN CADET, et al.,

      Plaintiffs,

         v.

DRAPER & GOLDBERG, PLLC, et al.,

      Defendants.

Civil Action No. 05 - 2105  (JDB)

## MEMORANDUM OPINION

      This diversity case arises from a real property auction gone awry.  On July 15, 2004 plaintiffs, John and Yves Cadet, placed the winning bid of $500,000 at a public auction for property located in northwest Washington, D.C.  Although they put down a $30,000 deposit on the day of their successful bid, plaintiffs -- despite their best efforts -- were ultimately unable to secure financing for the remainder of the purchase price.  Consequently, the defendants determined that the plaintiffs had breached the sale agreement and thus retained the $30,000 deposit as liquidated damages.  Plaintiffs promptly brought suit in a District of Columbia court alleging six counts: (1) fraud, (2) misrepresentation, (3) breach of contract, (4) wrongful conversion, (5) civil conspiracy, and (6) punitive damages.  Defendants removed the case to this Court and moved to dismiss the complaint for failure to state a claim upon which relief can be granted.  For the reasons set forth below, the Court will grant defendants' motions to dismiss.

## BACKGROUND

      Plaintiffs were browsing through the real estate section of the <u>Washington Times</u> during

1

May and June of 2004 when they happened upon an advertisement ("Ad") for the sale at public auction of "VALUABLE" property located at 2948 Albermarle Street, NW, Washington, D.C. 20008 (hereinafter "Subject Property"). Am. Compl. ¶¶ 9-10. The myriad of defendants in this action is a result of the series of steps that culminated in the ultimate auction of the Subject Property. James G. Barnes and Iraline G. Barnes were joint owners of the Subject Property and mortgagees under the Note and Deed of Trust on the Subject Property held by defendant G.E. Capital Mortgage Services, Inc. (hereinafter "G.E."). Id. ¶ 8, 34. G.E. then named defendant Wells Fargo as the servicer for the mortgage loan. Defs.' Wells Fargo Bank, Wells Fargo Home Mortgage, G.E. Capital Mortgage Services Mot. to Dismiss (hereinafter "Wells Fargo Mot. to Dismiss") at 2.[1] Upon default of the mortgagees, Wells Fargo in turn appointed defendant Draper & Goldberg, PLLC ("D&G"), as Substitute Trustee of the property; D&G then contracted to place the Ad in the Washington Times and arranged for the auction. Am. Compl. ¶¶ 3-5, 10.[2]

The Ad provided that the public auction would be held on July 15, 2004 at 10:30 a.m. Am. Compl. ¶ 9. In addition to providing the date of the sale, the Ad contained the following terms and conditions of the auction:

> A deposit of $30,000 will be required at time of sale in cash or certified funds, except from secured party. Property sold in "AS IS" condition. Subject to liens of record. Conveyance by special warranty deed. Settlement in 30 days. If Sub. Trustee cannot convey Insurable title, purchaser's sole remedy is return of deposit. Additional sale terms announced at sale.

---

[1]In their Amended Complaint, plaintiffs name both Wells Fargo Bank, N.A., and Wells Fargo Home Mortgage, Inc. as defendants in this action. Am. Compl. ¶¶ 6-7. For the purposes of this Memorandum Opinion, the Court will refer to the Wells Fargo defendants collectively as "Wells Fargo."

[2] In addition to D&G, plaintiffs have named as defendants the individual partners in that firm, L. Darren Goldberg and David Draper.

Wells Fargo Mot. Ex. A. The plaintiffs were attracted to the Subject Property because of its "location, the good schools in the area, the nearby shops, and the fact that it was five (5) minutes away and accessible to many areas that the Plaintiffs visited," and thus decided to attend the auction to bid on the property. Am. Compl. ¶ 11. In preparation for the auction, plaintiffs secured a pre-approved loan on July 7, 2004 in the amount of $526,000 from Market Street Mortgage subject to a satisfactory appraisal of the Subject Property by the lender. Id. ¶ 12. Significantly, plaintiffs did not perform a title search on the Subject Property prior to attending the auction, nor is it apparent that they made any physical inspection of the property at that time either. In addition, plaintiffs do not claim that the defendants made any additional representations -- aside from the description of the Subject Property in the Ad -- prior to the auction.

On the morning of the auction, plaintiffs placed the winning bid of $500,000, prevailing over two competing bidders.[3] Plaintiffs tendered the earnest money deposit in the amount of $30,000 and then signed a Memorandum of Sale with the substitute trustee D&G. Id. ¶¶ 15, 16. The Memorandum of Sale expressly provided that if the trustee failed for any reason to convey insurable title to the property, the purchaser's sole remedy was return of the deposit. Wells Fargo Mot. to Dismiss Ex. B. Moreover, the Memorandum of Sale further stated that:

---

[3] The other parties present at the auction were Ronald G. MacDonald and Marcia Wiss. Am. Compl. ¶ 14. According to plaintiffs, MacDonald and Wiss "(a) [are] well known to the Defendants, (b) claim a leasehold interest in the property, (c) were named parties to prior foreclosure procedures, (d) [are] owners of property adjacent to the Subject Property located at 3000 Albermarle Street, N.W., Washington D.C. 20008, and (e) . . . have a driveway easement in their favor existing on the Subject Property." Id.

> Settlement must be within 30 days of the sale date.  Time is of the essence.  If settlement does not occur within this time, the deposit may be forfeited, and the trustees may avail themselves of all other legal or equitable rights against the defaulting purchaser.

Id.  Unbeknownst to the plaintiffs, later that same day, James G. Barnes and Iraline G. Barnes filed a voluntary Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of Columbia.  Draper & Goldberg Mot. to Dismiss ("D&G Mot. to Dismiss") Ex. A.

Plaintiffs promptly notified Market Street Mortgage of their successful bid, which then proceeded to conduct an appraisal of the Subject Property.  Am. Compl. ¶ 19.  In August 2004, Market Street informed plaintiffs that the loan would not be approved owing to "inadequate or unacceptable" collateral in the Subject Property.  Id.  Unfortunately for plaintiffs, this was the beginning of a process that ultimately left them rejected in similar fashion by three additional lenders.  After receiving Market Street's decision, plaintiffs notified D&G of the rejection and assured defendant that they would continue to seek financing in good faith.  Id. ¶ 20.  Plaintiffs next turned to Money Tree Funding, LLC, which also refused to extend financing for the purchase of the Subject Property because said property did not "conform with its . . . zone" and consequently its value "as collateral for the proposed loan is very inadequate."  Id.

Following this second rejection, plaintiffs wrote to defendant Wells Fargo Bank by letter dated September 10, 2004 informing Wells Fargo of their difficulties in obtaining financing and requesting return of their $30,000 deposit.  Am. Compl. ¶ 22.  By letter dated September 14, 2004, plaintiff was notified by D&G that pursuant to the Memorandum of Sale, plaintiffs were required to tender the balance of the purchase price or else forfeit their deposit.  Id. ¶ 23.  D&G evidently then extended plaintiffs' initial 30-day window, setting a new deadline of September

4

27, 2004.  Id.  Facing the loss of their deposit, plaintiffs next turned to defendant Wells Fargo

Bank for financing.  Id. ¶ 26.  Before plaintiffs received a response from Wells Fargo, on

September 29, 2004 -- after granting plaintiffs an additional time extension of indeterminate

length -- D&G referred them to another lender, 1st American Mortgage, Inc., in a last ditch effort

to salvage the deal.  Id. ¶ 26, 27.  Plaintiffs promptly filed an application with 1st American

Mortgage, Inc., which initially approved plaintiffs' loan application on September 29, 2004.  Id. ¶

28.  On that same day, Wells Fargo also informed plaintiffs that it had approved a loan to

purchase the Subject Property.  Id. ¶ 31.

Plaintiffs, however, were not yet in the clear.  Just as with the prior two lenders, 1st

American subsequently denied plaintiffs' loan on October 16, 2004 following an appraisal that

indicated that the Subject Property was "unacceptable and inadequate collateral."  Id. ¶ 29.

Similarly, more than one month later, after conducting two separate appraisals, Wells Fargo Bank

also denied plaintiffs' loan for "substantially the same reason(s) as the other prospective lenders."

Id. ¶ 33.  In the meantime, however, on October 25, 2004 D&G had provided plaintiffs with a

notice of default of the Memorandum of Sale agreement and had indicated that defendants had

elected to retain plaintiffs' $30,000 deposit as liquidated damages.  Id. ¶ 32.

Plaintiffs now bring this action seeking return of their deposit in addition to other

compensatory and punitive damages.  Their six-count complaint alleges fraud, misrepresentation,

breach of contract, wrongful conversion, civil conspiracy, and punitive damages under District of

Columbia common law.  Defendant D&G has moved to dismiss all counts pursuant to Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Defendants Wells Fargo and G.E. have similarly moved separately to dismiss all counts on the

same grounds.

## STANDARD OF REVIEW

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted). Hence, although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is impossible, and 'that a recovery is very remote and unlikely,'" id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the "threshold requirement" of Fed. R. Civ. P. 8(a)(2) is "that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief,'" id. at 1966 (quoting Fed. R. Civ. P. 8(a)(2)).

The notice pleading rules, however, are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to

6

dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  Leatherman v. Tarrant County Narcotics &

Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at

1965)).  The plaintiff must be given every favorable inference that may be drawn from the

allegations of fact.  Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111,

1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if

such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept

legal conclusions cast in the form of factual allegations."  Kowal v. MCI Commc'n Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994); see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837

(D.D.C. 1996) (citing Papasan, 478 U.S. at 286).

Finally, the Federal Rules of Civil Procedure provide for a heightened pleading standard

for claims involving fraud.  Rule 9(b) requires that in "all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P.

9(b).  Although the particularity requirement distinguishes fraud claims from ordinary civil

pleadings, Rule 9(b) is still subject to the general "short and plain statement" command of Rule

8.  United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1256 (D.C.

Cir. 2004) (explaining that Rule 9(b) is not the "antithesis" of Rule 8).  Consequently, to satisfy

Rule 9(b), the "pleader must state the time, place and content of the false misrepresentations, the

fact[s] misrepresented and what was obtained or given up as a consequence of the fraud."  United

States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

## DISCUSSION

In Counts I and II of the Amended Complaint, plaintiffs seek damages for common law fraud and misrepresentation, respectively, based on certain allegedly fraudulent omissions on the part of the defendants during the auction process.  Count III requests relief on contractual grounds for defendants' alleged breach of the Memorandum of Sale for failure to refund plaintiffs' deposit.  In Count IV, plaintiffs allege that defendants have wrongfully converted their deposit, whereas in Count V they assert that defendants engaged in an unlawful conspiracy to deprive plaintiffs of their earnest money.  Finally, Count VI purports to state a claim for punitive damages based on defendants' allegedly intentional misconduct.  The Court will address each of these counts in turn.

**A. Fraud**

Plaintiffs' first and most all-encompassing claim is their assertion that defendants either individually or in concert "acted deceptively and fraudulently in that they intentionally misrepresented, concealed and withheld material facts."  Am. Compl. ¶ 37.  More specifically, plaintiffs state that defendants failed to disclose:

> (a) that the Subject Property had been offered for sale at public auction on several occasions over a period of several years without a consummated sale, (b) that the Subject Property was subject to an easement, (c) that the Subject Property was subject to a leasehold interest of undeterminable duration and an existing tenant, (d) that the property was unsuitable for the purpose intended, (e) that the auction was a sham transaction, (f) that the property was inadequate and unacceptable as collateral for financing, and (g) that the Defendants could not deliver title to the property.

Id.  In its essence, plaintiffs' contention is that the defendants knew that the Subject Property could not serve as collateral for a loan of $500,000 due to the undisclosed defects listed above.  Thus, in plaintiffs' view, the auction was merely a "sham" designed to misappropriate their

deposit because defendants knew that the deal would not be -- and, indeed, could not be -- ultimately consummated by the plaintiffs.  Defendants respond with two principal arguments: (1) that the plaintiffs have failed to plead fraud with particularity as required by Rule 9(b); and (2) that the Amended Complaint fails to state a fraud claim upon which relief can be granted for the purposes of Rule 12(b)(6).

    *1. Rule 9(b)'s Particularity Requirement*

    As noted above, Rule 9(b) imposes a heightened pleading requirement for cases involving fraud, requiring that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  The D.C. Circuit has construed Rule 9(b) to require that the pleader must "state the time, place and content of the false misrepresentation, the fact misrepresented and what was retained or given up as a consequence of the fraud." Kowal, 16 F.3d at 1278; see also U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd, 389 F.3d 1251, 1258 (D.C. Cir. 2004) (affirming dismissal of a complaint under Rule 9(b) because it "allege[d] no start date, name[d] a laundry list of individuals without specifying their relation to the fraudulent scheme . . . allege[d] a place only twice . . . and set[] forth no facts that exemplify the purportedly fraudulent scheme").  This inquiry is complicated somewhat in this case simply because the essence of plaintiffs' fraud claim revolves around nondisclosure rather than affirmative misrepresentation, and as such, plaintiffs must necessarily allege when and what they believe should have been disclosed by the defendants.

    At the outset, the Court finds that the plaintiffs have at least satisfied the particularity requirement for the "content of the false misrepresentation" prong of Rule 9(b).  In Paragraph 37 of their Amended Complaint (and elsewhere throughout), plaintiffs lay out with sufficient

specificity the nature and content of the information that they believe was fraudulently withheld from them.  The remainder of plaintiffs' fraud count, however, is more problematic.  To begin with, plaintiffs have not explicitly stated "when" they believe the defendants should have disclosed these supposedly material facts to them.  Presumably this is information that the plaintiffs would have wanted to receive prior to the foreclosure auction on July 15, 2004.  It is unclear, however, whether plaintiffs believe the disclosures should have been made in the Ad itself, in the Memorandum of Sale, or via oral notification during the morning of the auction but prior to the sale.  Nor have plaintiffs expressly stated what was "given up" as a consequence of the fraud; again, presumably plaintiffs believe that they "gave up" their forfeited deposit due to the omissions, but this is not stated particularly in Count I.

Defendants argue, moreover, that plaintiffs have impermissibly leveled their "allegations against all of the Defendants together."  Wells Fargo Mot. to Dismiss at 5.  Plaintiffs have indeed cast their allegations collectively against the defendants without specifying precisely which individual defendant they believe is responsible for each omission.  This objection does in fact find some support in D.C. Circuit case law.  See Martin-Baker Aircraft Co., Ltd, 389 F.3d at 1258 (criticizing the complaint's "laundry list of individuals without specifying their relation to the fraudulent scheme").  Plaintiffs respond that such a grouping does not violate Rule 9(b) in this instance because the alleged omissions can be attributed to all defendants collectively by virtue of "an agency relationship," yet they cite no authority for that proposition, nor do they elaborate on the existence of this "agency relationship" anywhere in their Amended Complaint.[4]

---

[4] Plaintiffs' entire argument regarding the "agency relationship" is contained in one sentence in their brief opposing summary judgment.  See Pls.' Opp'n at 7.  The Amended Complaint makes no reference to the alleged agency relationship and offers no additional

Pls.' Opp'n at 7.

The purpose of Rule 9(b) is to give defendants "adequate notice" of the specifics of a fraud claim against them so that they may "provide a meaningful response." <u>Daisley v. Riggs Bank</u>, 372 F. Supp. 2d 61, 78-79 (D.D.C. 2005). The ultimate Rule 9(b) inquiry in this case, then, is whether plaintiffs have satisfied that duty. It is a close question in this case, particularly because plaintiffs have sued various defendants but have not explicitly alleged the specific defendant that should be held responsible for each supposedly fraudulent omission. At the same time, however, the Amended Complaint likely does contain enough information for the defendants to be put on notice of the general substance of the fraud claim. Reading, as the Court must, Rule 9(b) "in conjunction" with Rule 8's requirement of a "short and plain statement of the claim," the Court is satisfied -- although just barely -- that plaintiffs have met the conditions of Rule 9(b). In any event, the Rule 9(b) question is not dispositive of the fraud issue, particularly because, as detailed below, the Court finds that the plaintiffs have failed to state a claim upon which relief can be granted in Count I.

## 2. Rule 12(b)(6)

Apart from any Rule 9(b) infirmities that may plague the Amended Complaint, the defendants also assert that plaintiffs have failed to state a claim upon which relief can be granted in Count I. Wells Fargo Mot. to Dismiss at 6; D&G Mot. to Dismiss at 11. At bottom, defendants argue that plaintiffs' fraud claim cannot survive a motion to dismiss because defendants had no duty to disclose any information to the plaintiffs; that is, defendants assert that

---

explanation concerning what particular defendants are responsible for the supposed fraudulent omissions.

the doctrine of caveat emptor precludes a claim for fraud in this instance.[5]  Plaintiffs, for their

part, assert that they have properly alleged a claim for fraud and that this case is governed by an

exception to the normal rule of caveat emptor.  Pls.' Opp'n at 3.

In the District of Columbia, the elements of fraud are: (1) a false representation or willful

omission in reference to a material fact, (2) made with knowledge of its falsity, and (3) with

intent to induce the party to rely on the representation or omission, where (4) the party relies

upon the representation or omission (5) to its detriment.  Schiff v. AARP, 697 A.2d 1193, 1198

(D.C. 1997).  It is well established under District of Columbia law that "mere silence does not

constitute fraud unless there is a duty to speak."  Kapiloff v. Abington Plaza Corp., 59 A.2d 516,

517 (D.C. 1948); see also In re Spectrum, Ltd., 2007 WL 2320587 at *2 (Bankr. D.D.C. Aug. 9,

2007) (collecting cases).  Such a duty to speak can arise either from a fiduciary relationship, see

Hogan v. Md. State Dental Ass'n, 843 A.2d 902, 908 (Md. 2004),[6] or from an instance where a

material fact or defect is unobservable or undiscoverable by "an ordinarily prudent person upon

---

[5] Although plaintiffs maintain that their fraud claim is "not based solely on fraudulent concealment," Pls.' Opp'n at 6, this Court disagrees.  The only affirmative representation prior to the sale that the plaintiffs point to is the Ad for the Subject Property that defendant D&G placed in the Washington Times.  Plaintiffs have not alleged that any information in that Ad, which expressly stated that the property was to be sold "AS IS" and "[s]ubject to liens of record" is false; in other words, plaintiffs have not claimed that the Ad itself is an affirmative misrepresentation.  Instead, plaintiffs essentially argue that defendants failed to disclose several additional facts that rendered the Ad, in their view, fraudulent or misleading.  Such a claim is properly considered as one for fraud by omission or fraudulent concealment.

[6] Courts look to the common law of Maryland for guidance when District of Columbia precedents are not directly on point.  Conesco Indus., Ltd. v. Conforti & Eisele, Inc., 627 F.2d 312, 316 (D.C. Cir. 1979) ("[S]ince . . . [the] District of Columbia does derive its common law from Maryland . . . . it is appropriate in matters concerning the District for which there is no District of Columbia law, that the District of Columbia court[] should look to the law of Maryland for guidance before it looks to the law of other states.").

reasonable inspection," <u>Loughlin v. United States</u>, 230 F. Supp. 2d 26, 50 (D.D.C. 2002).

Moreover, "fraud is never presumed" and a plaintiff must "allege such facts as will reveal the

existence of <u>all</u> the requisite elements of fraud." <u>Bennett v. Kiggins</u>, 377 A.2d 57, 59 (D.C.

1977) (emphasis added). In the specific context of a real estate foreclosure sale, "the doctrine of

*caveat emptor* applies . . . because a trustee makes no warranty of title and is generally subject to

no duty to investigate or describe outstanding liens or encumbrances." <u>Stuart v. Am. Sec. Bank</u>,

494 A.2d 1333, 1338 (D.C. 1985). Hence, a trustee in a foreclosure sale is under no duty to

disclose defects that are discoverable in the course of a reasonably prudent inspection. <u>Loughlin</u>

<u>v. United States</u>, 230 F. Supp. 2d 26, 50 (D.D.C. 2002) ("The doctrine of caveat emptor

precludes a purchasers' recovery for real estate defects where, among other things, the defect is

observable and discoverable by an ordinarily prudent person upon reasonable inspection.").

Upon consideration of the relevant case law and the standards governing dismissal under

Rule 12(b)(6), the Court finds that plaintiffs have failed to state a claim for fraud upon which

relief can be granted. Each of plaintiffs alleged fraudulent misrepresentations or omissions is

either barred by the doctrine of <u>caveat emptor</u> or otherwise legally deficient under Rule 12(b)(6).

Consequently, as demonstrated below, plaintiff has failed to establish the first element of fraud: a

misrepresentation or omission regarding a material fact.

As an initial matter, the Court notes that the doctrine of <u>caveat emptor</u> governs under the

facts of this case. As <u>Stuart</u> makes plain, a trustee in a bankruptcy sale is under no duty to

disclose encumbrances or defects to a purchaser. 494 A.2d at 1338. Thus, the trustee stands in

no form of fiduciary relationship that would impose a duty to speak that would trump the normal

application of <u>caveat emptor</u> in an arm's length real estate transaction. Moreover, none of the

13

allegedly fraudulent omissions or representations that the plaintiff (as discussed below) has put forward meets the second exception to <u>caveat emptor</u> because those defects could have been discovered by "an ordinarily prudent person upon reasonable inspection." Loughlin, 230 F. Supp. 2d at 50.

Turning to the plaintiffs' first allegation, the Court finds that the defendants did not commit a fraudulent omission in neglecting to inform the plaintiffs of the prior foreclosure sales. Am. Compl. ¶ 37. As defendants point out, foreclosure notices are matters of public record and are recorded under District of Columbia law. Draper & Goldberg Resp. to Pls.' Opp'n at 7. Thus, had plaintiffs performed a title search prior to bidding on the Subject Property, they would have been aware of the previous foreclosure notices and attempts. In Stuart, the court made clear that performing a record search for encumbrances and defects is just the sort of step that constitutes the required "reasonable inspection" for a foreclosure sale. 494 A.2d at 1338 ("In the instant case appellant discovered the [encumbrance] in the Office of the Recorder of Deeds. The disputed advertisement was thus sufficient to enable a prospective purchaser, 'by the exercise of ordinary intelligence to locate the property and to obtain more detailed information concerning it.'"). Defendants were under no duty to disclose the prior foreclosure notices because the plaintiffs could have discovered them in the exercise of "reasonable inspection." See Loughlin, 230 F. Supp. 2d at 50. Hence, plaintiffs' allegations regarding the foreclosure notices are barred by the doctrine of caveat emptor and cannot provide the basis for a claim of fraud.

Plaintiffs' next two claims can be dealt with in similar fashion. The defendants did not notify the plaintiffs that the Subject Property was subject to an easement and that it was also subject to a leasehold interest of "undeterminable duration and an existing tenant." Am. Compl.

¶ 37.  Both of these allegations fail to provide a sufficient basis for a claim of fraud.  First, it is unclear from the face of the Amended Complaint whether the easement in question is recorded or not; ultimately, however, that fact does not matter for the purposes of resolving this motion.  If the easement was recorded at the time that the plaintiffs bid on the Subject Property, then a proper title search would have revealed the encumbrance to the plaintiffs.  Thus, as above, since the exercise of "reasonable inspection" via a record search would have provided plaintiffs with the information in question, defendants were under no obligation to disclose it.  See Loughlin, 230 F. Supp. 2d. at 50.

If, instead, the easement was not recorded at the time, then plaintiffs would have taken title to the Subject Property as bonafide purchasers (assuming no other notice is imputed to them) free from the encumbrance in any event.  See Clay Properties, Inc. v. The Washington Post Co., 604 A.2d 890, 898 (D.C. 1992) ("A purchaser who conducts a proper title search, as the Post did here, is fully protected against all unrecorded interests falling within the recording statute, with the exception of any as to which the purchaser has actual or inquiry notice.").  Moreover, if the easement was unrecorded, plaintiffs have not explicitly alleged that defendants were aware of its existence, a requisite element of fraudulent omission.  Defendants, of course, cannot be found liable for fraud if they were unaware of the easement in the first place.  See Schiff, 697 A.2d at 1198 (requiring that the defendant be aware of the falsity of the representation or omission).  For these reasons, the alleged omission regarding the easement that burdens the Subject Property -- recorded or not -- is not a sufficient foundation for plaintiffs' fraud claim.

The leasehold interest presents the same issue as the easement, except that plaintiffs have affirmatively asserted that the leasehold interest was unrecorded.  Pls.' Opp'n at 3-4.  Plaintiffs

argue that the unrecorded leasehold was neither "readily observable" nor "discoverable," and should therefore fall into the recognized exception to caveat emptor that governs defects that are not discoverable upon reasonable inspection. See Loughlin, 230 F. Supp. 2d at 50; see also Witherspoon, 963 F. Supp. 455, 459 (D.D.C. 1997) (holding that plaintiff adequately pled that defendant, a tobacco company, had a duty to disclose because of plaintiff's "inability to discover the addictive nature of nicotine" on his own). The defect at issue in Loughlin, however, is markedly different from those in this case. In Loughlin, toxic chemicals and munitions were buried beneath the ground in such a fashion that they were "impossible for anyone, no less an ordinarily prudent person, to discover." Id. The leasehold interest in this case, however, is not similarly "impossible" to discover. Although the leasehold interest was not recorded, in the District of Columbia notice "may be actual, constructive, or inquiry." Clay Properties, 604 A.2d at 895. Consequently, the physical presence of a tenant would arguably have put plaintiffs on inquiry notice of the possibility of a tenancy. Id. at 895-96 ("A purchaser is held to be on inquiry notice where he or she is aware of circumstances which generated enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances."). As with the foreclosure notices and the easement, a physical inspection followed by reasonable inquiry may indeed have revealed the leasehold to plaintiffs prior to the sale, which indicates that defendants had no duty to disclose this information to plaintiffs. In any event, even if plaintiffs were alternatively not charged with inquiry notice -- that is, for argument's sake, the physical possession in question was not "sufficiently distinct and unequivocal so as to put the purchaser on his guard," id. at 896 -- then they would have taken title to the property free of the leasehold under the District of Columbia recording statute. In either

case, plaintiffs fail to establish a basis for a fraudulent omission with their assertions with respect to the easement and unrecorded leasehold.

The next allegation that the plaintiffs put forward is that the "property was unsuitable for the purpose intended." Am. Compl. ¶ 37. Plaintiffs' elaborate on this contention in their Opposition Brief, where they claim that the defendants fraudulently concealed that the property lot in question was "unbuildable." Pls.' Opp'n at 4. According to plaintiffs, the lot's "frontage is too small to build a residential unit" and the defendants "knew that the Plaintiffs could not build a residential unit." Id. As an initial matter, the Court notes that plaintiffs have not alleged in either their Amended Complaint or their briefing that the defendants in fact knew that the plaintiffs wanted to build a residential unit at the time of the auction. Instead, plaintiffs claim that defendants D&G made undefined "continued . . . affirmative misrepresentations and omissions in reference to the property" following the auction; they also note that defendants did become "well aware" after the auction that plaintiffs "intended to . . . build a residential house" on the lot. Pls.' Opp'n at 7. For the purposes of fraud, the relevant time frame for that knowledge is prior to the purchase because the chief concern is that plaintiffs would have been wrongfully induced to enter into an agreement. Naturally, defendants cannot be liable for fraudulent concealment because the property is unsuitable for residential building if they were unaware that plaintiffs in fact wanted to engage in such an endeavor.

In any event, the unbuildable lot contention suffers from another familiar flaw: the alleged defect could have been discovered via reasonable inspection. Plaintiffs argue that this defect was "unobservable and undiscoverable," Pls.' Opp'n at 4, but defendants point out that the Ad contained sufficient information to enable plaintiffs to commission a title search or a survey

17

of the Subject Property.[7]  See Stuart, 494 A.2d at 1338 ("The disputed advertisement was . . . sufficient to enable a prospective purchaser, 'by the exercise of ordinary intelligence to locate the property and to obtain more detailed information concerning it.'").  Wells Fargo Reply to Pls.' Opp'n at 4-5.  Because plaintiffs failed to take any of those steps, they are held to the doctrine of caveat emptor because they did not make a "reasonable inspection" of the Subject Property prior to the auction.  Consequently, defendants were under no duty to disclose those facts to the plaintiffs.  Thus, this allegation cannot support plaintiffs' fraud claim either.

Plaintiffs also include "that the [Subject Property] was inadequate and unacceptable as collateral for financing" as a fraudulent omission by defendants.  This ground also fails.  The allegation is logically derivative in nature.  By plaintiffs' own arguments, the Subject Property was inadequate collateral precisely because of the supposed defects discussed above.  Am. Compl. ¶ 38.  Hence, because the Court holds that defendants had no duty to disclose any of those defects to begin with, it follows that they similarly were not obligated to divulge this information either.

Finally, plaintiffs' two remaining assertions of  intentional withholding fail as actionable omissions because they are mere legal conclusions.  Plaintiffs assert that "the auction was a sham transaction."  Am. Compl. ¶ 37.  Such a characterization is a legal conclusion rather than a factual allegation and therefore is not a basis for the omission element of fraud.  Kowal, 16 F.3d at 1276 (explaining that the court need not "accept legal conclusions cast in the form of factual allegations").  Likewise, although it is discussed in more detail in Part C of this Memorandum

---

[7] In fact, as asserted in their Original Complaint but not their Amended Complaint, that is precisely how plaintiffs became aware of the defects after their successful bid.  Original Compl. ¶¶ 49, 51-52.

Opinion, plaintiffs' contention that defendants "could not deliver title to the property" is unsupported by adequate factual allegations to survive a motion to dismiss.  See infra Part C.

In sum, most of the facts that plaintiffs allege were fraudulently concealed from them cannot form a basis for an actionable fraud claim because the doctrine of caveat emptor did not require defendants to disclose such information.  The remaining allegations are unsupported legal conclusions and similarly do not lay the foundation for an actionable claim for fraud.  In essence, plaintiffs' failure to conduct any pre-auction investigation of the Subject Property precludes their ability to state a valid claim for fraud in this case.  Plaintiffs had ample time to make such an investigation.  As the Amended Complaint makes plain, plaintiffs first viewed the Ad in the Washington Times on May 10, 2004, which indicates that they had over two months to conduct a physical inspection, a title search, and/or a survey of the Subject Property.  Nor do plaintiffs allege that there were any barriers to conducting such an inspection.  Moreover, the very terms of the Ad itself -- "AS IS . . . Subject to liens of record . . . Conveyance by special warranty deed," Am. Compl. ¶ 10 -- should have served as sufficient warning to prospective purchasers to undertake a thorough investigation of the Subject Property prior to placing a bid on it.  In a passage appropriate to this case, the District of Columbia Court of Appeals in Stuart put it harshly but succinctly: "That [plaintiff] failed to obtain the information before the foreclosure sale is no one's fault except his own."  494 A.2d at 1339.  Because it fails to state a fraud claim upon which relief can be granted, Count I is accordingly dismissed.[8]

---

[8] Although the Court need not decide whether plaintiffs have sufficiently alleged the other elements of a fraud claim, the Court notes that the plaintiffs' entire pleading concerning the remaining elements consists of the following averments: "The representations and omissions were in reference to material facts. . . . That they were made with actual and constructive knowledge of their falsity. . . . That they were made with intent to deceive Plaintiffs. . . . That the

**B. Misrepresentation**

In Count II of the Amended Complaint, plaintiffs assert a claim for misrepresentation. In essence, plaintiffs restate the same allegations from Count I in practically identical language. Am. Compl. ¶¶ 44-49. As an initial matter, the Court notes an apparent ambiguity in District of Columbia law concerning misrepresentation. Some courts have held that <u>intentional</u> misrepresentation is an element of fraud itself, and is therefore not an independent cause of action. <u>See, e.g., High v. McLean Fin. Corp.</u>, 659 F. Supp. 1561, 1566 n.4 (D.D.C. 1987) ("Intentional misrepresentation is . . . an essential element of the tort of fraud, not a separate tort in itself."). Defendants Wells Fargo and G.E. latch on to this concept and argue that Count II should be dismissed outright. Wells Fargo Mot. to Dismiss at 9. The District of Columbia, however, does recognize the doctrine of "innocent misrepresentation," by which a party may rescind a contract due to an innocent material representation. <u>See Barrer v. Women's Nat'l Bank</u>, 761 F.2d 752, 758 (D.C. Cir. 1985) ("It is well established that misrepresentation of material facts may be the basis for the rescission of a contract, even where the misrepresentations are made innocently, without knowledge of their falsity and without fraudulent intent."). Since the plaintiffs only make reference to "misrepresentation" in Count II, it is not clear from the face of

---

Plaintiffs relied to their detriment. . . . That the Plaintiffs suffered substantial harm." Am. Compl. ¶¶ 39-43. The Supreme Court recently held that a complaint must contain more than mere "labels and conclusions . . . and a formulaic recitation of the elements of a cause of action will not do . . . ." <u>Twombly</u>, 550 U.S. at ____, 127 S. Ct. at 1965. In this case, it does appear that plaintiffs have pled a mere "formulaic recitation" of the remaining elements of the fraud claim. This is even more apparent against the backdrop of District of Columbia precedent that requires that a plaintiff "allege such facts as will reveal the existence of <u>all</u> the requisite elements of fraud." <u>Bennett</u>, 377 A.2d at 59 (emphasis added). Rather than assert such factual allegations, however, plaintiffs have evidently relied on one-sentence conclusions mimicking the required elements of fraud. As such, plaintiffs may indeed have failed to "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at ____, 127 S. Ct. at 1965.

the Amended Complaint whether they assert a claim for innocent or fraudulent misrepresentation. For the purposes of this analysis, the Court will assume that plaintiffs intended to state a claim for innocent misrepresentation, as fraudulent misrepresentation is properly dealt with in the fraud context. As discussed below, plaintiffs have failed to allege an actionable innocent misrepresentation cause of action.

There are four main elements to an innocent misrepresentation claim. The recipient of the supposed misrepresentation must establish that: (1) the defendant made an assertion that was "not in accord with the facts"; (2) the assertion concerned a material fact; (3) the plaintiff relied upon the assertion; (4) plaintiff was justified in that reliance; and (5) plaintiff relied to her detriment.[9] Barrer, 761 F.2d at 758. Furthermore, "[u]nder very limited circumstances, a failure to disclose a material fact may be deemed a misrepresentation sufficient to void a contract." Resolution Trust Corp. v. District of Columbia, 78 F.3d 606, 609 (D.C. Cir. 1996). Those "very limited circumstances" can impose a duty to speak where disclosure:

> (a) [I]s necessary to prevent a previous assertion from being a misrepresentation or from being fraudulent or material, (b) would correct a mistake of the other party as to a basic assumption on which that party is making the contract, if non-disclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing, or (c) would correct a mistake of the other party as to the contents or effect of a writing. [The Restatement] also provides that where the other person is entitled to know the nondisclosed facts because of a relation of trust and confidence that exists between the parties, non-disclosure is equivalent to an assertion of facts.

Barrer, 761 F.2d at 758 (deriving the elements from the Restatement (Second) of Contracts

---

[9] The District of Columbia is one of the minority of jurisdictions that permits an innocent misrepresentation claim to proceed as either a cause of action to rescind the contract and restore the status quo or a cause of action for damages in tort. Barrer, 671 F.2d at 758 n.29. For the purposes of this Memorandum Opinion, this distinction is immaterial. In either case, plaintiffs' relief would likely be the same: return of the $30,000 deposit.

("Restatement")).

In the instant case, plaintiffs fail to allege adequately that defendants have made an assertion "not in accord with the facts." The only relevant affirmative representation made by the defendants was contained in the contents of the Ad in the <u>Washington Times</u>. As plaintiffs appear to concede, there is nothing that is false or misleading about the Ad on its face. Pls.' Opp'n at 7. Thus, plaintiffs have not alleged that defendants have made any statements not in accordance with the facts.

Plaintiffs have also not established that any of the <u>Barrer</u> conditions that would permit a cause of action in misrepresentation based on nondisclosure have been satisfied. Turning to the first factor, the Ad contained no assertions that need to be clarified to prevent them from being misleading. The Ad stated in plain terms that the Subject Property was being sold "AS IS" and "[s]ubject to liens of record"; it is quite evident that defendants made no representations regarding the quality or nature of the Subject Property that they would need to correct. Next, plaintiffs have not demonstrated that defendants had a duty to speak to correct plaintiffs' "basic assumption on which [plaintiffs] [were] making the contract." <u>Barrer</u>, 761 F.2d at 758. Plaintiffs were purchasers at a public auction. They have made no allegations that defendants were even aware that plaintiffs intended to build a residential dwelling on the Subject Property, much less that defendants were aware that such an intention was a "basic assumption" motivating plaintiffs' bidding. Furthermore, defendants were under no obligation to correct plaintiffs' mistake as to any writing in this case. The only relevant writing, as discussed above, is the Ad itself, and plaintiffs could not have been mistaken about the contents of the Ad, which quite plainly disclaims any warranties or representations regarding the quality and nature of the Subject

Property.  Finally, as also discussed above, because the doctrine of caveat emptor applies in the foreclosure sale context, defendants and plaintiffs stood in no "relation of trust" that would impose upon defendants a duty to disclose.  Id.  Consequently, plaintiffs have failed to satisfy the first element of a misrepresentation claim and the claim in Count II should therefore be dismissed.

Alternatively, even if the Court were to find that plaintiffs adequately met the other requirements of an actionable misrepresentation claim, they would nonetheless falter on the fourth element: justifiable reliance.  In Resolution Trust, the D.C. Circuit expounded on the justifiable reliance requirement.  78 F.3d at 609.  Relying heavily on the Restatement of Contracts and the accompanying comments, the D.C. Circuit explained that: "If the recipient knows that the assertion is false or should have discovered its falsity by making a cursory examination, his reliance is clearly not justified and he is not entitled to relief."  Id. (quoting Restatement § 172 cmt. b) (emphasis added).  As detailed above, plaintiffs in this case did not make any reasonable investigation of the property prior to placing their bid on July 15, 2004.  Such an investigation -- whether in the form of a title search, land survey, or detailed physical examination -- is precisely the sort of "cursory examination" that is a prerequisite to an actionable claim under Resolution Trust.  Consequently, plaintiffs' failure to make such an investigation precludes their recovery on misrepresentation grounds because they cannot satisfy the detrimental reliance component that is required to establish an actionable claim.  Accordingly, Count II is hereby dismissed.

## C. Breach of Contract

According to plaintiffs' claims in Count III, defendants breached the Memorandum of

Sale agreement by refusing to refund their deposit money. As the Memorandum of Sale makes plain, defendants were obliged to deliver "insurable" title to the plaintiffs. Am. Compl. ¶ 16. Moreover, the Memorandum of Sale expressly contemplated that the defendants would refund plaintiffs' deposit money only in the event that defendants failed to deliver insurable title. Hence, the basis for plaintiffs' claim for breach of contract appears to rest on one of two premises: (1) that defendants could not, in fact, deliver insurable title to plaintiffs owing to defects in the Subject Property itself; or (2) that defendants were without authority to deliver insurable title due to the bankruptcy filing of James and Iraline Barnes. As explained below, the Court rejects both of these contentions. Significantly, Count III is devoid of one critical allegation required to survive a motion to dismiss: that the defendants in fact failed to convey insurable title. Put another way, plaintiffs have not alleged that defendants actually breached the Memorandum of Sale.

Plaintiffs allege that the defendants could not convey insurable title because the property was subject to both an easement and a leasehold interest and because the property was inadequate collateral for plaintiffs to secure adequate financing. Am. Compl. ¶ 51. As defendants correctly point out, however, these are not factors that necessarily render title uninsurable. Wells Fargo Mot. to Dismiss at 11. Insurable title and marketable title are not synonymous terms. Whereas marketable title is title "that a reasonable buyer would accept because it appears to lack any defect," Black's Law Dictionary 1493 (7th ed. 1999), insurable title is "title which the designated title company, in the honest exercise of its professional judgment, would in fact insure." Aronoff v. Lenkin Co., 618 A.2d 669, 677 (D.C. 1992); see also Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 50:20 (4th ed. 1993). Consequently, plaintiffs' allegations

concerning encumbrances, inadequate collateral, and other defects in the Subject Property are not

probative of whether defendants have breached their duties under the Memorandum of Sale

because such allegations go to the <u>marketability</u> of title rather than whether title is <u>insurable</u>.

Instead, the proper inquiry is whether defendants could in fact deliver insurable title at closing;

defendants could not have breached the contract before that time because they were under no

duty to deliver insurable title until that point.[10]  Significantly, plaintiffs make no claim that any

title insurance company either refused or would refuse to insure the Subject Property's title.[11]  In

short, plaintiffs have alleged no facts that can support an inference that defendants could not

convey insurable title to the plaintiff.

In addition to complaining of the undisclosed defects in the Subject Property, plaintiffs

claim that the voluntary bankruptcy petition of the record owners precluded defendants from

ultimately delivering insurable title.  Although it is not entirely clear from the face of the

Amended Complaint, the crux of this allegation evidently centers around the automatic stay of

proceedings concerning the debtor's estate associated with filing a bankruptcy petition.  <u>See</u>

<u>generally</u> 9B Am. Jur. 2d Bankruptcy § 1723.  Significantly, however, the record owners did not

file their petition until 3:20 p.m. on July 15, 2004, <u>after</u> the plaintiffs had already successfully bid

on the Subject Property during that same morning.  Am. Compl. ¶ 35; D&G Mot. to Dismiss Ex.

A.  The United States Bankruptcy Court for the District of Columbia addressed a strikingly

---

[10]For their part, defendants maintain that they were ready and willing to deliver insurable title to plaintiffs at all times relevant to this action.  D&G Mot. to Dismiss at 9-10.

[11] It is worth noting that unlike many sale contracts that provide for insurable title, the Memorandum of Sale in this case did not call for any specific title insurance company to issue insurance to the title in question.

similar factual scenario in In re Carlietha M. Murphy, 342 B.R. 671 (Bankr. D.D.C. 2006). In
that case, the court held: "Because the debtor's petition was not filed until after the foreclosure
sale was held, no automatic stay was in place to stay the sale. Once the gavel fell at the
foreclosure sale, only the purchaser's rights arising from the sale remained to be enforced." Id. at
673. The instant case presents precisely the same situation; as in In re Carlietha M. Murphy,
since the plaintiffs completed their auction purchase before the owners filed for bankruptcy, no
automatic stay attached to the Subject Property. Thus, defendants were not precluded from
proceeding with the transaction by the bankruptcy petition.

In sum, plaintiffs have failed to state a claim for breach of contract. They have pled no
allegations that demonstrate that defendants neglected to perform a duty owed to plaintiffs under
the Memorandum of Sale. Significantly, since plaintiffs neglected to tender their performance
under the Memorandum of Sale by paying the balance of the purchase price, defendants were in
fact never put in a position to deliver the title to plaintiffs in any event. Plaintiffs' bare assertion
that defendants could not deliver insurable title is not sufficient to trigger defendants' duty to
refund the deposit, and thus plaintiffs fail to make out a claim for breach of contract. Count III is
accordingly dismissed.

**D. Wrongful Conversion**

In a recurring theme, in Count IV plaintiffs assert that defendants have wrongfully
converted their earnest money deposit by failing to refund it. In the District of Columbia,
"[c]onversion has generally been defined as any underlined unlawful exercise of ownership, dominion or
control over the personal property of another in denial or repudiation of his rights thereto." Flocco
v. State Farm Mutual Auto. Ins. Co., 752 A.2d 147, 158 (D.C. 2000) (quoting Chase Manhattan

Bank v. Burden, 489 A.2d 494, 495 (D.C. 1985)) (emphasis added).  In this case, plaintiffs declare

that defendants have exercised "ownership, dominion and control" over the deposit without

"permission or justification."  Am. Compl. ¶ 53.  Defendants, however, in fact have a lawful claim

to plaintiffs' deposit by virtue of the Memorandum of Sale that expressly provides for forfeiture of

the deposit in the event of default.  As noted above with respect to Count III, plaintiffs did not

perform under that agreement.  Defendants retention of the deposit was not, therefore, "unlawful"

for the purposes of conversion because of the contractual right that accrued as a result of plaintiffs'

failure to pay the balance of the purchase price to defendants.  See Flocco, 752 F.2d at 160

(holding that the defendants were not liable for conversion because they were arguably entitled to

"the right to file a[n] [insurance] claim under [their] policy").  Hence, Count IV is dismissed

because plaintiff has not stated a claim for conversion.

**E. Conspiracy**

Count V contains plaintiffs' allegations that defendants engaged in a civil conspiracy to

deprive plaintiffs of their deposit money.  Am. Compl. ¶ 56.  In the District of Columbia, civil

conspiracy is not an independent claim, but rather "'a means for establishing vicarious liability for

[an] underlying tort.'"  Weishapl v. Sowers, 771 A.2d 1014, 1023-24 (D.C. 2001) (quoting Griva v.

Davison, 637 A.2d 830, 848 (D.C. 1994)).  To make out a prima facie case for civil conspiracy in

the District of Columbia, a plaintiff must properly allege: (1) an agreement between two or more

entities, (2) to participate in an unlawful purpose, and (3) an overt act in furtherance of that

agreement.  Weishapl, 771 A.2d at 1023.

The factual allegations contained in Count V are impermissibly bare to withstand a motion

to dismiss on the civil conspiracy claim.  In effect, plaintiffs simply restate the allegedly

27

fraudulent omissions and misrepresentations discussed in detail above, adding that the defendants concealed such information "in concert and by agreement." Am. Compl. ¶¶ 56-60. Plaintiffs also now assert that defendants acted "fraudulently or deceptively" by permitting MacDonald and Wiss to participate in the public auction in order to run up the bid. Id. at 58. As defendants point out, however, it is difficult to see how "allowing members of the public . . . to attend a public auction is either illegal or furthers an illegal scheme" -- at the very least, it is difficult to draw that inference without further factual allegations, particularly concerning the existence of an unlawful agreement in the first instance. D&G Mot. to Dismiss at 16.

In short, plaintiffs claim that defendants collectively conspired to deprive plaintiffs of their deposit, but they have failed to plead any facts to establish the existence of such a specific agreement between defendants. Instead, they rely upon conclusory statements that defendants engaged in allegedly fraudulent activity "in concert and by agreement or understanding" as the sole basis for the existence of an unlawful agreement. Although the Court must assume that the allegations in the complaint are true for the purposes of a motion to dismiss, as noted above, the Court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal, 16 F.3d at 1276. In this case, plaintiffs have failed to plead any facts that can support an inference of the required element of agreement for the purposes of civil conspiracy. Accord Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000) (explaining that conclusory statements in a complaint concerning conspiracy that were devoid of "specific facts to support [the] assertions . . . of an agreement" are insufficient to support civil conspiracy claim). Accordingly, Count V of the Amended Complaint is dismissed.

**F. Punitive Damages**

Plaintiffs' final count is a claim for punitive damages in the amount of $21,000,000.  Am. Compl. ¶ 61.  As defendants correctly point out, however, punitive damages is a remedy, not a freestanding ground for relief.  Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. America, 81 F. Supp.2d 70, 74 (D.D.C. 2000) ("[P]unitive damages is a remedy and not a freestanding cause of action and should be dismissed."); see also Gharib v. Wolf, No. 06-1645, 2007 WL 2225895, at *4 (D.D.C. July 31, 2007) ("Punitive damages is a remedy and not a freestanding cause of action.").  Hence, Count VI of the Amended Complaint is dismissed.


## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motions to dismiss in their entirety.  A separate Order accompanies this Memorandum Opinion.


/s/
_____
JOHN D. BATES
United States District Judge

Dated: September 28, 2007